## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | | |
|---|---|---|
| EDWARD L. LANE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:08-01205 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on the parties'

cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 13.) Both parties have

consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 2 and 3.)

The Plaintiff, Edward L. Lane (hereinafter referred to as "Claimant"), filed an application

for DIB on January 21, 2005, alleging disability as of April 29, 2004, due to problems with his back,

knees, ankles, and nerves.[1] (Tr. at 19, 95, 96-98, 103, 107.) The claim was denied initially and on

reconsideration.[2] (Tr. at 72-74, 78-80.) On November 21, 2005, Claimant requested a hearing before

an Administrative Law Judge (ALJ). (Tr. at 85.) The hearing was held on July 20, 2006, before the

Honorable Glenn B. Hammond. (Tr. at 734-68.) By decision dated September 18, 2006, the ALJ

---

[1] Claimant filed previous applications for DIB and SSI on January 31, 2002, and January 6, 2003 (protective filing dates), which claims were denied initially and on reconsideration. (Tr. at 16.)

[2] On reconsideration, Claimant alleged arthritis and diabetes as additional disabling impairments. (Tr. at 78.)

determined that Claimant was not entitled to benefits. (Tr. at 19-24.) The ALJ's decision became the final decision of the Commissioner on August 21, 2008, when the Appeals Council denied Claimant's request for review. (Tr. at 7-10.) On October 21, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain

v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we

3

consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since April 29, 2004, his alleged onset date. (Tr. at 21.) Under the second inquiry, the ALJ found that Claimant suffered from degenerative disc disease of the lumbosacral spine, degenerative arthritis of the right knee, and depression, which were severe impairments. (Tr. at 21 and 23, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 22 and 23, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity for sedentary exertional work as follows:

> The claimant retains the residual functional capacity to perform low-stress work at the sedentary level of exertion that does not require climbing or involve exposure to hazards or moving machinery.

(Tr. at 23, Finding No. 4.) At step four, the ALJ found that Claimant could not return to his past

relevant work. (Tr. at 22 and 23, Finding No. 5.) On the basis of testimony of a Vocational Expert

("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs

such as an assembly worker and a bench worker, at the sedentary level of exertion. (Tr. at 23 and

24, Finding No. 10.) On this basis, benefits were denied from April 29, 2004, through June 24, 2006.

(Tr. at 26, Finding No. 11.) Beginning June 25, 2006, the ALJ found that Medical-Vocational Rule

201.14, 20 C.F.R. Part 404, Appendix 2, Subpart P, directed a finding of disability. (Tr. at 26,

Finding No. 12-14.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by

substantial evidence.

6

Claimant's Background

Claimant was born on June 25, 1956, and was 50 years old at the time of the administrative hearing, July 20, 2006. (Tr. at 23, 96, 737-38.) Claimant had an eighth grade education and a Generalized Equivalency Diploma. (Tr. at 24, 116, 737-38.) In the past, he worked as a security guard and boiler operator. (Tr. at 22, 108-09, 118-24, 765.)

Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing Claimant's complaints of pain. (Document No. 12 at 4-12.) He asserts that pain is the primary factor in his limited functioning and is the primary cause of his mental impairment. (Id. at 4.) Specifically, Claimant alleges that the ALJ failed to address his statements regarding the intensity, duration, and limiting effects of his symptoms, except to note them, at step two of the pain and credibility assessment. (Id. at 4-5.) He asserts that the ALJ failed to discuss or address the factors set forth in SSR 96-7p in determining whether his symptoms were credible. (Id. at 6.) Claimant asserts that the ALJ also failed to address the credibility of the opinions of the various examiners and treating sources. (Id. at 5.) Claimant advances three arguments for the assertion that the medical evidence supports a finding that his pain was so severe between April 29, 2004, and June 24, 2006, as to have precluded sustained work. (Id. at 7.) First, the MRI studies of March 23, 2001, and June 20, 2002, revealed significant back findings that explained the chronicity of Claimant's problems. (Id.) Second, regarding his functional limitations, Claimant asserts that the ALJ improperly relied in part on the evaluation by Dr. Padmanaban, which indicated that Claimant was "not willing" to return to work, despite other medical evidence that indicated that Claimant was unable to work. (Id. at 7-8.) The ALJ failed to explain the relevance of Dr. Padmanaban's statement,

which suggested that the ALJ determined that Claimant refused to work. (Id. at 8.) Claimant asserts that Dr. Padmanaban's examination supports Claimant's claims, as it indicated that Claimant attempted to return to work and aggressively sought medical care and treatment for his condition. (Id.)

Third, Claimant asserts that the ALJ focused very little on Claimant's efforts to treat his pain. (Document No. 12 at 9.) Claimant notes that treatment included surgery, care at a pain clinic, and chiropractic care, and that he sought more advanced pain management but was denied by the West Virginia Workers' Compensation Division. (Id.) Furthermore, psychological testing revealed that his pain significantly interfered with his functioning in social activities, recreation activities, family and home responsibilities, and self-care activities. (Id.)

With regard to Claimant's physical complaints, the Commissioner first asserts that the three Functional Capacity Evaluations conducted in November 2001, December 2001, and July 2002, respectively demonstrated that Claimant magnified his symptoms to a moderate degree, could perform limited medium to limited medium-heavy work with a 30 to 60 pound lifting maximum, and could perform medium level work. (Document No. 13 at 7.) The Commissioner also cites the report by Oasis in July 2003, that reflected Claimant's functioning at the light exertional level. (Id.) Regarding the opinion evidence of record, the Commissioner asserts that Claimant's treating surgeon, Dr. Koja advised Claimant to seek a different job and re-training; that Dr. Padmanaban, an orthopedic surgeon, agreed that Claimant could go back to limited medium to limited medium-heavy work with limitations on lifting 30 to 60 pounds; and that Dr. Ramas, also an orthopedic surgeon opined that Claimant was not disabled. (Id. at 7-8.) The Commissioner also cites the opinions of the two state agency reviewing physicians that Claimant could perform light work. (Id. at 8.)

Consequently, the ALJ was not required to give controlling weight to the opinions of Drs. Carlson and Kropac because they are contrary to the evidence that he could at least perform sedentary work prior to June 25, 2006. (Id.)

Regarding Claimant's mental complaints, the Commissioner notes that two state agency psychologists opined that Claimant could perform simple, unskilled work. (Id. at 8.) Nevertheless, the ALJ accommodated Claimant's mental complaints by restricting him to simple, routine, repetitive, low-stress work. (Id. at 9.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and summarizes it herein in relation to Claimant's arguments.

On March 6, 2001, Claimant injured his back at work when he slipped on ice on a concrete walkway at work. (Tr. at 181, 202, 245, 445.) Claimant worked the remainder of the week, but his pain increased and on March 13, 2001, he went to the Emergency Room at Welch Community Hospital complaining of abdominal and right groin pain. (Tr. at 202, 483-87.) The x-rays of Claimant's left hip and pelvis revealed no abnormalities. (Tr. at 483, 487.) Claimant was discharged with a diagnosis of left groin ligament strain and was prescribed pain medications and referred to Dr. David Ells to rule out a hernia. (Tr. at 445, 483.) On March 19, 2001, x-rays of Claimant's lumbosacral spine revealed osteoarthritic changes and degenerative disc disease ("DDD") with a subluxation of L3 on L4. (Tr. at 481.) Dr. Ells referred Claimant to Dr. Abed A. Koja, M.D., a neurosurgeon, for his complaints of back and leg pain. (Tr. at 202.)

Claimant sought treatment from Dr. Koja from March 21, 2001, through December 21, 2001. (Tr. at 210-24.) On March 21, 2001, Claimant complained of intolerable back pain and left leg pain,

9

with numbness at the L5 dermatome. (Tr. at 218.) Physical exam revealed positive straight leg raising at 60 degrees on the left and no weakness. (Id.) Dr. Koja diagnosed a possible herniated lumbar disc at L5 on the left and recommended a lumbar MRI and conservative treatment with heat, massage, and ultrasound. (Tr. at 219.) A lumbar MRI on March 23, 2001, demonstrated a small herniated disc at L5-S1 and degenerative disc disease with bulging at multiple levels. (Tr. at 224.)

Claimant underwent physical therapy from March 22, 2001, through April 25, 2001, as prescribed by Dr. Koja, for complaints of back pain and left lower extremity radicular pain. (Tr. at 176-82.) On March 22, 2001, Claimant reported increased pain when driving, and that he was unable then to perform his woodworking hobby or household chores, such as taking out the trash. (Tr. at 181.) Claimant presented with decreased stance on the left lower extremity, an antalgic gait, and increased tenderness to palpation of his lumbar spine. (Id.) Claimant reported pain at a level six out of ten and that he took Tylenol 3 and prescription pain medications for pain. (Id.) On March 28, 2001, Claimant reported that he was in fair condition and that his pain was at a level five out of ten. (Tr. at 180.) Claimant reported pain in the right lumbar and thoracic region after having walked quite a bit at home over the weekend. (Tr. at 178.) On April 25, 2001, Claimant reported that he was in fair condition, but experienced a lot of pain the night before. (Tr. at 176.) The physical therapist noted that Claimant presented with mild strength increases, but decreased range of motion. (Id.)

Claimant returned to Dr. Koja on April 11, 2001, at which time he continued to complain of back and left leg pain. (Tr. at 217.) His exam was unchanged from March 21, 2001, and Dr. Koja noted moderate back pain with flexion and extension. (Id.) Dr. Koja diagnosed a herniated lumbar disc at L5-S1 on the right, though his pain was reported on the left. (Id.) Dr. Koja therefore did not believe that the pain was from the herniated disc, and recommended epidural blocks for the pain,

to be followed by a lumbar myelogram if unsuccessful. (Id.) After two epidural blocks, Claimant reported to Dr. Koja on June 13, 2001, that the first block helped, but that the second block did not and that he had experienced increased pain in his back and right leg over the last few days. (Tr. at 216.) His exam remained unchanged and Dr. Koja recommended a myelogram and post myelogram CT scan. (Id.)

A lumbar myelogram on July 5, 2001, demonstrated a small extradural deformity on the right at L5-S1, a small ventral extradural deformity at L4-5, DDD at L4-S1, and transitional vertebra of the thoracolumbar junction. (Tr. at 220-21.) The post myelogram lumbar CT scan revealed L5-S1 posterior disc bulging, L4-L5 mild diffuse annular bulging, and L5-S1 bilateral facet joint arthritis. (Tr. at 222.) Dr. Koja advised Claimant that if his pain was severe, then he recommended surgery of the L5-S1 foraminotomy with removal of the herniated disc. (Tr. at 215.) On July 23, 2001, Claimant elected to proceed with the surgery because his back and right leg pain continued without much improvement. (Tr. at 214.)

Claimant underwent a lumbar laminectomy at L5-S1, with removal of hernia lumbar disc, by Dr. Koja on August 9, 2001. (Tr. at 184.) On August 17, 2001, Dr. Koja noted that Claimant was doing very well in general and encouraged him to exercise, walk, and soak in a bathtub. (Tr. at 213.) He prescribed Lorcet for pain as needed. (Id.) On September 8, 2001, however, Claimant continued to complain of back and left leg pain with some improvement from the previous pain. (Tr. at 212.) On exam, Claimant exhibited moderate pain with flexion and extension, and his straight leg raising remained positive at 60 degrees bilaterally. (Id.) Dr. Koja referred Claimant for a work-hardening program with the hopes that he would be able to return to work. (Id.)

On November 2, 2001, Claimant was referred for a Functional Capacities Evaluation. (Tr.

11

at 202-09.) Claimant reported constant pain in the right side of his low back and a tingling sensation in his right leg, which he rated at between pain levels of three and five out of ten. (Tr. at 203.) He also reported occasional pain in the left side of his lower back, which he rated at a degree of three to five out of ten. (Id.) The results indicated that Claimant was capable of performing work in the limited light to limited medium work classification. (Tr. at 208.) Clinical findings however, suggested that Claimant magnified his symptoms to a moderate degree. (Id.) Claimant was advised to undergo work conditioning. (Id.)

Claimant completed 26 of 30 scheduled work conditioning sessions on December 13, 2001. (Tr. at 186.) The Exit Functional Capacities Evaluation revealed that Claimant was capable of performing work in the limited medium to limited medium-heavy work classification, with a 30 to 60 pound lifting maximum, depending upon the position. (Tr. at 190.)

Claimant returned to Dr. Koja on December 21, 2001, at which time he continued to complain of back and right leg pain, which was prominent in the mornings after arising and moving around. (Tr. at 211.) Claimant reported little improvement with conservative treatment and the work-hardening program. (Id.) Dr. Koja noted Claimant's back and right hip pain at 90 degrees on the left, moderate pain with flexion and extension, with positive straight leg raising at 60 degrees on the right, but noted no weakness. (Id.) He diagnosed post laminectomy syndrome and noted that Claimant had "reached the maximum improvement." (Id.) Dr. Koja advised Claimant to change jobs, which may require schooling or re-training through vocational rehabilitation, and released Claimant from his care. (Id.)

Claimant wrote to the West Virginia Workers' Compensation division and authorized the change of his treating physician from Dr. Koja to Dr. George Dauwel, a chiropractor. (Tr. at 414,

447.) Dr. Koja gave Claimant a slip to return to work on January 19, 2002, noting that the vocational rehabilitation had assessed functional capacity limits beginning January 5, 2002. (Tr. at 447.) On March 4, 2002, Claimant began treatment with Dr. Dauwel. (Tr. at 414-18.) Claimant complained of pain across the entire lumbo pelvic area, right hip, and leg. (Tr. at 415.) Following the laminectomy, Claimant reported that the pain began radiating through the spine to the top of his shoulders. (Id.) On exam, Claimant was able to walk on his heels and toes, was able to squat three fourths of the way, and with some assistance with one hand, to arise to the exam table. (Id.) He elicited tenderness in the left side through the lumbar spine, with tenderness on the right less than on the left. (Id.) Dr. Dauwel noted weakness of leg resistance, flexion, and extension. (Id.) Range of lumbar motion was reduced with pain and straight leg raising was positive at 19 degrees on the right and 32 degrees on the left. (Id.) Dr. Dauwel diagnosed lumbar sprain and sciatic radiations. (Tr. at 416.) He recommended pain management and noted that Claimant continued "to be disabled, unable to return to his usual work or any alternative work with little help from medications at this point." (Id.) Claimant continued under Dr. Dauwel's care until December 19, 2003. (Tr. at 298-413.) On January 28, 2003, Dr. Dauwel noted that Claimant walked with a mild limp, was unable to stand much more than 20 minutes at a time, and experienced difficulty riding in a vehicle. (Tr. at 335.) On May 22, 2003, Dr. Dauwel noted that Claimant's prognosis was poor, as was his ability to return to work. (Tr. at 304.)

On May 23, 2002, Dr. Ramanathan Padmanaban, M.D., conducted an independent medical evaluation of Claimant. (Tr. at 445-51.) Claimant reported some lower back pain and pain in the right hip area and leg. (Tr. at 448.) He noted occasional sharp back pain, and indicated problems standing or sitting for long periods of time and problems bending. (Id.) Physical exam revealed that

13

Claimant could walk a straight line, was able to walk on his heels and toes with some back discomfort, and was able to stand without any problems. (Tr. at 449.) Straight leg raising was 40 degrees on either side in the supine position and 60 degrees in the sitting position. (Id.) Despite complaints of numbness of the right lower extremity, sensation was intact on both lower extremities. (Id.) Dr. Padmanaban diagnosed pelvic and lower back strain and a herniated disc at L5-S1 with radiculopathy. (Id.) He concurred that if there were no new findings on a repeat MRI and the pain is managed, then Claimant would be at maximum medical improvement and should be able to return to medium to limited medium-heavy work with limitations on lifting 30 to 60 pounds. (Tr. at 450.)

A lumbar MRI on June 20, 2002, showed benign post-operative changes at L5-S1, multi level DDD unchanged, and degenerative changes of the lumbosacral facets. (Tr. at 418.)

A Functional Capacity Evaluation on July 23, 2002, by Dr. Hirsh at HealthSouth revealed that Claimant was capable of performing medium exertional work. (Tr. at 232-38.) A further evaluation on October 24, 2002, revealed an improvement in Claimant's functional ability and again it was determined that he could perform work at the medium exertional level. (Tr. at 227-31.)

Claimant initiated treatment from Dr. Robert P. Kropac, M.D. on October 3, 2002, for complaints of right knee pain. (Tr. at 245.) Claimant reported that on September 27, 2002, his right knee gave out while walking and he fell on his right knee. (Tr. at 246.) He describe his right knee pain as steady and constant and that the pain was increased with being up and with motion and walking. (Id.) On exam, Dr. Kropac noted some tenderness of the right knee, but also noted normal strength and range of motion with some pain. (Tr. at 247.) Dr. Kropac noted some atrophy, which was not related to his knee condition. (Id.) Dr. Kropac diagnosed a contusion of the right knee and prescribed Celebrex. (Tr. at 248.) Claimant continued to complain of right knee pain on October 24,

14

2002, and Dr. Kropac ordered an MRI. (Tr. at 243-44.) On December 17, 2002, Claimant continued to complain of right knee pain, as well as constant lower back pain that was increased with stooping, bending, and prolonged sitting and standing. (Tr. at 241.) On exam, Dr. Kropac noted some tenderness over the lower lumbosacral spine and related paraspinal muscle masses with tenderness extending into the right buttock. (Id.) Straight leg raising was positive on the right with pain. (Id.) He noted that sensation was intact and that there was some tenderness of the right knee. (Id.) Dr. Kropac again diagnosed contusion of the right knee, rule out internal derangement. (Tr. at 242.) On January 28, 2003, Claimant continued to complain of right knee pain, lower back pain, and lower extremity radiation of pain. (Tr. at 239-40.) Physical exam remained constant. (Tr. at 239.)

Claimant participated in a pain management program at the Oasis Multidisciplinary Based Rehabilitation Services from May 27, 2003, through July 30, 2003. (Tr. at 251-88.) A Treatment Summary, dated July 30, 2003, revealed that Claimant demonstrated "a level of psychological functioning/stability certainly sufficient for him to continue to participate further along the Workers' Compensation intervention continuum, whether it is return to work, job search, or retraining." (Tr. at 252.) The Report also noted that Claimant's pain severity decreased from an average level at admission to a below average level. (Id.)

On August 21, 2003, Dr. Clifford H. Carlson, M.D., evaluated Claimant at the request of his attorney. (Tr. at 289-96.) Dr. Carlson noted Claimant's complaints of headaches and dizziness, neck and left shoulder pain, low back pain, and right leg and foot numbness and pain. (Tr. at 293.) Claimant exhibited tenderness of the lumber spine. (Id.) He was able to walk with a good gait, though he could not get up well to walk on his heels or toes. (Tr. at 294.) Upper extremity motor strength and sensation was intact, though Claimant had decreased pin sensation throughout the left

lower extremity. (Id.) Dr. Carlson concluded that Claimant's injury resulted in chronic lumbosacral spine sprain/strain syndrome with aggravation of degenerative disease. (Tr. at 295.) He also had a herniated nucleus pulposus at L5-S1, which required laminectomy and he then suffered post laminectomy syndrome. (Id.) Dr. Carlson also noted that Claimant suffered from major depression. (Id.) He therefore opined that Claimant was "unable to engage in any substantial gainful employment," and was not a candidate for vocational rehabilitation. (Id.)

Claimant sought treatment from Dr. Steven B. O'Saile, D.O., from May 23, 2003, through August 26, 2004, for a right wrist fracture. (Tr. at 452-57.) Claimant attempted to step in an elevator which was not at the current floor and fell down the elevator shaft one story, and injured his arm in multiple areas. (Tr. at 510.) As of August 26, 2004, Dr. O'Saile noted that Claimant's fracture had healed, though flexion and extension remained decreased. (Tr. at 452.) He directed Claimant to perform home exercises several times a day, and to return for follow-up only as needed. (Id.)

Claimant returned to Dr. Padmanaban on May 4, 2004, for an independent medical re-evaluation. (Tr. at 422-39.) Claimant complained of lower back pain with pain radiating to the right hip and leg. (Tr. at 428.) Due to the severity of the pain, Claimant reported that he had problems sleeping and awoke with pain. (Id.) He also reported that he could not stand, sit, or lift for prolonged periods of time. (Id.) Claimant reported however, that he was able to perform all activities of daily living with the exception of lifting heavy objects or standing and sitting for long periods of time. (Id.)  Physical exam revealed that Claimant was able to walk a straight line without problems or assistive devices, and that he could walk on his heels and toes without any difficulty. (Tr. at 429.) His gait and station were normal. (Id.) There was tenderness of the lumbar spine without spasm. (Id.) Straight leg raising was 45 degrees on either side in the supine position and 70 degrees bilaterally

16

sitting. (Tr. at 430.) Dr. Padmanaban diagnosed acute lumbosacral strain with herniated disc at L5-S1 with radiculopathy, status post laminectomy and discectomy at L5-S1, and chronic lower back pain syndrome. (Tr. at 431.) Dr. Padmanaban noted that when Oasis Pain Program was about to release Claimant to return to work, "he did not want to go back to work," and therefore, "wrote a letter to the employer that he was no longer able to do his duties." (Id.) Dr. Padmanaban further noted that Claimant told him the same thing: that "he did not want to go back to work" and wanted him to give an impairment rating. (Id.) Dr. Padmanaban opined that Claimant's "injury is stable. He is at maximum medical improvement. He is not willing to go back to work. He is ready for an impairment rating." (Id.) Dr. Padmanaban assigned either a ten or 17 percent whole person impairment, depending on the model used. (Tr. at 431-32.)

On December 9, 2004, Dr. Mario C. Rama, M.D., an orthopedic surgeon, conducted an evaluation of Claimant. (Tr. at 488-502.) Claimant complained of back pain, which he described as two bones rubbing together; right lower extremity pain at times and numbness, especially with cold, damp weather; and right hip pain. (Tr. at 491.) He reported his activities of daily living to include washing dishes and clothes, straightening up the house, mowing the yard except for an embankment, sitting on the porch, performing some home repairs, and doing puzzles for two to three hours a day. (Id.) Physical exam revealed that Claimant moved slowly with a mild limp on the right side. (Id.) His lower back was tender to palpation and ranges of back motion were reduced. (Tr. at 491-92.) Claimant was able to walk on his heels and toes and could squat while holding on to something. (Tr. at 492.) Dr. Rama did not recommend any further treatment or physical therapy and opined that Claimant had "reached maximum degree of medical improvement," and was "not disabled from working due to his compensable injury." (Id.) He noted however, that Claimant may have difficulty

17

returning to heavy PDL and therefore, and further noted that his last functional capacity evaluation placed him on medium to medium/heavy PDL. (Tr. at 492-93.) Finally, Dr. Rama noted that Claimant's injury-related impairments were not expected to be progressive, but that the degenerative changes to his lumbar spine would progress. (Tr. at 494.)

On April 14, 2005, Dr. Russ L. Go-Lee, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 514-21.) Dr. Go-Lee opined that Claimant was capable of performing work at the light exertional level, with occasional postural limitations, except that he should never climb ladders, ropes, or scaffolds. (Tr. at 515-16.) He further opined that Claimant should avoid concentrated exposure to temperature extremes and should avoid even moderate exposure to vibration and hazards. (Tr. at 518.)

William C. Steinhoff, Jr., a licensed psychologist, performed a neuropsychological screening profile on May 13, 2005. (Tr. at 567-73.) Claimant reported that his "nerves" had bothered him for four years. (Tr. at 567.) He further reported problems sleeping, low energy levels and depressed moods for the last two to four years, a history of suicidal thoughts without planning or attempts, feelings of anger and rage, and that he did not like being around crowds. (Tr. at 568.) On mental status exam, Mr. Steinhoff noted that Claimant exhibited fair eye contact, was anxious, was fully oriented, and had clear and coherent speech at a normal rate. (Tr. at 570.) His affect was restricted in range, his thought process was slow but coherent, and he did not exhibit any bizarre thought content, hallucinations, or delusions. (Id.) Claimant's insight was limited, his judgment was average, his immediate and remote memory was normal, and his recent memory was markedly deficient. (Id.) Mr. Steinhoff noted that Claimant's concentration was mildly deficient, that he was restless during the evaluation and processed things slowly, and his pace and persistence were moderately deficient.

18

(Id.) Claimant reported daily activities to include performing self care, yard work with a riding mower once or twice a month, watching television, reading the newspaper, and sometimes listening to the radio. (Id.) He denied any involvement in organized activities or visiting family and friends. (Id.) Intelligence testing placed Claimant at the borderline range of intelligence. (Tr. at 571.) Mr. Steinhoff diagnosed major depressive disorder, recurrent, moderate; chronic pain disorder associated with psychological factors and a general medical condition; panic disorder without agoraphobia; and borderline intellectual functioning. (Tr. at 572.) He opined that Claimant's prognosis was poor to fair with effective treatment and treatment compliance. (Tr. at 573.)

On June 17, 2005, Rosemary L. Smith, Psy.D., completed a form Mental Residual Functional Capacity Assessment and Psychiatric Review Technique. (Tr. at 574-78, 579-91.) Dr. Smith opined that Claimant's ability to understand and remember detailed instructions, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, was moderately limited. (Tr. at 574-75.) She opined that Claimant retained "the ability to learn and perform simple, unskilled work-like activities." (Tr. at 576.) She further opined that Claimant's borderline intellectual functioning, major depressive disorder, generalized anxiety disorder versus panic disorder, and pain disorder resulted in mild restrictions of activities of daily living and maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 579-88.)

Claimant treated with Dr. Riaz Uddin Riaz, M.D., a psychiatrist, from January 21, 2002, through July 25, 2005. (Tr. at 594-631.) Dr. Riaz's diagnoses included major depression, moderately

severe; generalized anxiety disorder, moderately severe; and a GAF of 50 on January 21, 2002. (Tr. at 631.) Claimant was treated with medications. (Tr. at 594-631.)

On September 20, 2005, Marcel G. Lambrechts, M.D., completed a form Physical Residual Functional Capacity Assessment. (Tr. at 632-39.) Dr. Lambrechts opined that Claimant could perform light exertional level work, with occasional postural limitations, except that he could never climb ladders, ropes, or scaffolds, or balance. (Tr. at 633-34.) Due to Claimant's complaints of pain in his shoulders, wrists, and hands, with some numbness in his hands, probably resulting from his wrist fracture, Dr. Lambrechts opined that Claimant's ability to reach in all directions, gross manipulation, and feelings were limited. (Tr. at 635.) He further opined that Claimant should avoid concentrated exposure to extreme cold and even moderate exposure to vibration and hazards. (Tr. at 636.)

On September 21, 2005, Dr. Debra L. Lilly, Psy.D., completed a form Mental Residual Functional Capacity Assessment and Psychiatric Review Technique. (Tr. at 640-43, 644-57.) Dr. Lilly opined that Claimant was moderately limited in the following abilities: to understand, remember, and carry out detailed instructions, and maintain attention and concentration for extended periods. (Tr. at 640.) She opined that Claimant retained "the ability to learn and perform simple, unskilled, work-like activities." (Tr. at 642.) Dr. Lilly opined that Claimant's major depressive disorder and generalized anxiety disorder resulted in mild limitations in performing activities of daily living and maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 644-654.) Dr. Lilly found it interesting that it was "not apparent that [Claimant] has any limitations related to his perceived memory problems." (Tr. at 656.)

20

Claimant also sought treatment from the Beckley VAMC from August 25, 2005, through April 10, 2006, primarily for his physical impairments, but also for his mental impairments. (Tr. at 658-92.) On March 24, 2006, a CT scan of Claimant's lumbar spine revealed an annulus bulge and disc protrusion at L4-5 and L5-S1, as well as degenerative changes throughout the vertebral bodies. (Tr. at 684.) Claimant was treated with pain medications. (Tr. at 682.)

On June 28, 2006, Dr. Kropac completed an Independent Medical Examination of Claimant at his counsel's request. (Tr. at 702-09.) Claimant complained of low back pain with right greater than left lower extremity radiation of pain, right and left knee pain, neck pain, and right wrist pain with limitation of motion. (Tr. at 702.) On physical exam, Claimant exhibited tenderness to palpation over the cervical spine with limited range of motion and increased neck pain. (Tr. at 704.) Claimant had limited range of right wrist and forearm motion. (Tr. at 705.) Motor strength and sensation were intact throughout the bilateral upper extremities. (Tr. at 704-05.) Dr. Kropac noted that there was no evidence of atrophy. (Tr. at 705.) Claimant also exhibited tenderness to palpation over the lower lumbosacral spine with limited range of motion and increased back pain. (Id.) Straight leg raising testing was positive on the right at 80 degrees with lower back pain and right lower extremity radiation of pain. (Tr. at 706.) Straight leg raising testing also was positive on the left with complaints of low back pain. (Id.) Claimant had full range of motion of all the joints of the lower extremities, but with complaints of increased low back pain on ranging of his hips. (Id.) He had full motor strength of the lower extremities and was able to heel and toe walk with difficulty, but without evidence of weakness. (Id.) His gait was non-antalgic and he was unable to squat secondary to knee pain. (Id.) Dr. Kropac diagnosed cervicodorsal musculoligamentous strain; lumbar disc herniation, status-post laminectomy/discectomy with residual right lower extremity

21

radiculitis; contusion of the right knee with patellofemoral chondromalacia of the right and left knee; and comminuted fracture, right dorsal radius, status-post ORIF with residuals of the right wrist. (Tr. at 709.) Dr. Kropac opined that Claimant was "not capable of engaging in substantial gainful employment based on his age, education, work history and residual functional capacity as well as his psychological impairments and psychiatric impairments. He should be considered to be permanently totally disabled." (Id.)

Dr. Kropac also completed a form Medical Opinion Re: Ability to Do Work-Related Activities (Physical), on which he concluded that Claimant was disabled. (Tr. at 710-13.) Specifically, Dr. Kropac opined that Claimant could occasionally lift and carry ten pounds and frequently less than ten pounds; could sit, stand, and walk less than two hours in an eight-hour workday; could sit 30 minutes before changing positions; could stand 20 minutes before changing positions; must walk around every five minutes for a period of five minutes; and required the opportunity to shift at will from sitting or standing and walking. (Tr. at 710-11.) He noted that Claimant would need to lie down three or four times at unpredictable intervals during a work shift. (Tr. at 711.) Dr. Kropac further opined that Claimant could occasionally twist, stoop, crouch, and climb stairs; could never climb ladders; was limited in reaching handling, and pushing or pulling; and should avoid concentrated exposure to hazards, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 711-12.) He noted that Claimant's impairments would cause him to miss about three days of work each month. (Tr. at 712.) Finally, Dr. Kropac opined that Claimant's pain was "present and found to be incapacitating." (Tr. at 713.) He noted that physical activity such as walking, standing, or bending increased Claimant's pain to the extent that medication and/or bed rest was necessary. (Id.)

22

<u>Analysis</u>.

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; <u>See also</u>, <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. <u>Id.</u> at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." <u>Mickles v. Shalala</u>, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. <u>Hyatt v. Sullivan</u>, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;

23

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements.

24

Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations.  A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1520(c) and 416.920)(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless,  Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 22.) The Court finds that the ALJ failed to make an explicit finding at the first step of the pain and credibility assessment. It can be read into the opinion that the ALJ found that Claimant's degenerative arthritis of the right knee and DDD of the

lumbosacral spine, as well as his depression, could reasonably be expected to cause the alleged symptoms, but the ALJ did not make such an explicit finding. Accordingly, such failure constitutes remand. In Arnold v. Barnhart, Civil Action No. 1:04-0422 (S.D. W.Va. Sept. 29, 2005), this Court further held that Craig mandates "that an ALJ must make an *explicit* determination that a claimant has or has not proven an underlying medical impairment that could cause the pain alleged by the claimant." Id. at 11.

> [T]he ALJ's failure to expressly reach a conclusion regarding the first part of the pain disability test, the threshold question of whether a claimant has "an underlying medical impairment that could reasonably be capable of causing the pain alleged," constitutes a failure to apply the correct legal standard in determining that a claimant is not disabled by pain.

Id. at 14.

Nevertheless, assuming that the ALJ's statements satisfied the first prong, the Court finds that the ALJ's analysis at the second step falls short of what is required by the applicable law and Regulations. The ALJ devoted only two paragraphs to assessing Claimant's pain and credibility. In the first paragraph, the ALJ addressed Claimant's physical impairments, noted that several functional capacity evaluations resulted in the ability to perform medium exertional work, noted Dr. Padmanaban's summary of Claimant's statement that he was not willing to work, and addressed the opinion of Dr. Kropac, to which the ALJ assigned great weight. The ALJ assigned weight to the opinion of only Dr. Kropac, and simply noted many of the other opinions. Moreover, the ALJ did not address adequately the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) and SSR 96-7p, in assessing Claimant's pain and credibility. In his summary of the medical evidence preceding the pain and credibility assessment, the ALJ noted Claimant's treatment to include surgery and chiropractic treatment. (Tr. at 20-22.) However, the ALJ failed to address other measures,

26

including medications, utilized to alleviate Claimant's symptoms. Nor did the ALJ discuss the precipitating and aggravating factors of Claimant's symptoms. With regard to Claimant's activities, the ALJ noted Claimant's testimony that he primarily relied on others to perform most household chores and that he typically read, watched television, and listened to the radio. (Tr. at 20.) The ALJ did little more than summarize the evidence, including Claimant's testimony, in assessing Claimant's pain and credibility. Accordingly, the Court finds that in view of the foregoing evidence, the ALJ's pain and credibility assessment is not supported by substantial evidence.

After careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, for the reasons set forth in this Memorandum Opinion and by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.) is **GRANTED**, Defendant's Motion for Judgment on the Pleadings (Document No. 13.) is **DENIED**, the final decision of the Commissioner is **REVERSED**, and this matter is **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings and is **DISMISSED** from the active docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 31, 2010.

R. Clarke VanDervort
United States Magistrate Judge

27